IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

VICTOR CRIVILARE,                            )
                                             )
         Plaintiff,                          )
                                             )
vs.                                          )
                                             )   Case No. 3:21-cv-858-DWD
UNION   PACIFIC   RAILROAD   CO.,            )
STEVEN BYBEE, VERNON JAMES, and             )
MICHAEL PRINCE,                              )
                                             )
         Defendants.                         )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court is Defendants' Motion and Memorandum in Support of Summary Judgment ("Motion for Summary Judgment"). (Doc. 74). Plaintiff filed a Response in Opposition to the Motion for Summary Judgment. (Doc. 80). Thereafter, Defendants filed a Reply, which Plaintiff seeks to strike. (Docs. 81, 82, 83). As explained below, the Motion to Strike and the Motion for Summary Judgment are **DENIED**.

## I. BACKGROUND

Plaintiff worked as a locomotive engineer for Defendant, Union Pacific Railroad Company ("Union Pacific"), between February 12, 1996, and March 20, 2020. On January 29, 2020, Plaintiff began a 5:00 a.m. shift at Defendant's railyard in Villa Grove, Illinois. (Doc. 1, pg. 2). He was allegedly working with Mike Garfield, a conductor, and James Strubinger, a brakeman. (Doc. 1, pg. 2). At around 5:20 a.m., Plaintiff, while walking to his assigned locomotive, "fell and struck his chest on the rail while attempting to walk in poorly lit and hazardous conditions." (Doc. 1, pg. 2). Plaintiff assessed himself after the

fall, "conclud[ing] that he only suffered…a painful bruise and[,] although he was sore, he would still be able to perform his duties." (Doc. 1, pg. 2). Plaintiff believed his chest was improving, so he worked eight other shifts before February 9, 2020. (Doc. 1, pg. 2).

On the evening of February 9, 2020, Plaintiff began to experience severe shortness of breath and a radiating pain in his shoulder, which he thought was the result of a heart attack. (Doc. 1, pg. 2). He called in sick from work to obtain medical treatment. (Doc. 1, pg. 2). Plaintiff, rather than having a heart attack, allegedly "suffered rib fractures and a laceration to his spleen when he fell on January 29, 2020." (Doc. 1, pg. 2).

The next day, February 10, 2020, Plaintiff reported the January 29, 2020, incident to a supervisor, Glenn Davis. (Doc. 1, pg. 4). Plaintiff completed a Report of Personal Injury or Occupational Illness, consistent with the aforementioned allegations, on February 11, 2020. (Docs. 1, pg. 4; 1-2). The following week, on February 18, 2020, Plaintiff received a Notice of Investigation from Defendant, Vernon James, who was the Manager of Train Operations for Defendant. (Docs. 1, pg. 4; 1-3). Plaintiff was advised as follows:

> On 02/10/2020, you reported an alleged personal injury that you advised took place on January 29, 2020[,] while working as the engineer….It is alleged that your delay in reporting an incident and personal injury as required by the FRA has hindered the Company's ability to investigate this alleged incident and is a possible violation of 1.6-Conduct. Further, you allegedly misrepresented the events as reported on the On Duty Personal Injury Report concerning the alleged events of January 29, 2020. This is a possible violation of the following rule(s) and/or policy: 1.6: Conduct – Dishonest.

(Doc. 1-3).

The Notice of Investigation indicated a date and time for a hearing that would develop the facts and determine Plaintiff's responsibility, if any, in relation to the charge. (Doc. 1-3). Plaintiff was advised that the charge was a "[d]ismissal event." (Doc. 1-3).

One week before that hearing, on March 6, 2020, the Local Chairman of the Brotherhood of Locomotive Engineers and Trainmen, Chaderick Black, pursuant to Section 16 of the System Agreement-Discipline Rule, specifically requested that Mr. Garfield and Mr. Strubinger be presented as witnesses at the hearing. (Docs. 1, pg. 4; 1-5). Nevertheless, Plaintiff alleges neither of those witnesses, who were working with Plaintiff on the date of the incident, were present at the hearing. (Docs. 1, pg. 4, 1-4).

The above-described hearing occurred on March 13, 2020. (Docs. 1, pg. 4; 1-4). Defendant, Michael Prince, who was a Senior Manager of Train Operations, conducted the hearing. (Doc. 1, pg. 4). At the hearing, Defendant James, who was the charging officer, indicated Plaintiff was dishonest since "[t]he video evidence shows…not a single sign of any outward trauma…[and he] [w]as able to work two weeks without incident." (Docs. 1, pg. 4; 1-4, pg. 39). He also noted Plaintiff "[n]ever came to me and said anything about it…[or] anything to any manager, that I'm aware of." (Docs. 1, pg. 4; 1-4, pg. 39). On March 20, 2020, Plaintiff received a letter from Defendant Steven Bybee, who was Defendant's General Manager of Transportation, indicating Plaintiff was dismissed from Defendant's employ due to the dishonesty charge being sustained. (Doc. 1, pgs. 4-5).

Plaintiff initiated this case with a 2-Count Complaint. (Doc. 1).[1] In Count I, Plaintiff alleges Defendants violated § 20109(a)(4) of the Federal Rail Safety Act ("FRSA") because he was fired for reporting an injury at work. *See* 49 U.S.C. § 20109(a)(4); (Doc. 1, pg. 5). In Count II, Plaintiff alleges Defendant Union Pacific was negligent on January 29, 2020, under the Federal Employers' Liability Act ("FELA"). *See* 45 U.S.C. § 51; (Doc. 1, pg. 6).

## II. ANALYSIS

Defendants seek summary judgment on both Counts I and II of the Complaint. The Court grants that relief if Defendants show there is no genuine dispute as to any material fact, such that they are entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *accord Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (quoting *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015); citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Assertions that a fact cannot be or is genuinely disputed must be supported by citations to the materials of record. *See* Fed. R. Civ. P. 56(c)(1)(A). Alternatively, the assertions must be supported by a showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce evidence to support the fact. *See* Fed. R. Civ. P. 56(c)(1)(B).

If Defendants present evidence showing the absence of a genuine dispute of material fact, then the burden shifts to Plaintiff to provide evidence of specific facts creating a genuine dispute of material fact. *See Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citing *Hudson Ins. Co. v. City of Chic. Heights*, 48 F.3d 234, 237 (7th Cir. 1995)). A

---

[1] Earlier in this case, Plaintiff was given the opportunity, pursuant to his request, to file a First Amended Complaint that voluntarily dismissed Defendant Prince. (Docs. 48, 49, 66, 73). Plaintiff never did so. Therefore, the operative Complaint, wherein Mr. Prince remains named as a Defendant, is at Doc. 1.

genuine dispute of material fact exists if there is sufficient evidence for Plaintiff to receive a verdict. *See Driveline Systems*, 936 F.3d at 579 (quoting *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018), *reh'g denied* (Oct. 30, 2018)). Speculation about a material fact, unsupported by evidence, does not defeat summary judgment. *See Moje v. Fed. Hockey League, LLC*, 377 F. Supp. 3d 907, 920 (N.D. Ill. 2019) (citing *Sbika v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018); *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994)).

When considering a motion for summary judgment, the Court does not determine credibility, weigh the evidence, or decide which inferences to draw from the facts, as those tasks are within the province of a jury. *See Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (quoting *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018)). Instead, based on the record evidence, the Court merely decides whether a genuine dispute of material fact requires a trial. *See id.* (quoting *Johnson*, 892 F.3d at 893). When doing so, the Court construes the evidence in a light most favorable to the nonmovant while avoiding the temptation of deciding one party's version of facts is more likely true than the other party's version of facts. *See id.* (quoting *Johnson*, 892 F.3d at 893).

Having outlined these procedural principles, the Court now separately considers whether summary judgment is appropriate on Counts I or II of the Complaint.[2]

---

[2]The Court notes it has addressed many but not all of the factual allegations of the parties, as it "is 'not bound to discuss in detail every single factual allegation put forth at the summary judgment stage.' " *Outley v. City of Chicago*, 354 F. Supp. 3d 847, 856 (N.D. Ill. 2019) (quoting *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011)). As always, the Court only relies upon those portions of the record that are supported and necessary to a resolution. *See Outley*, 354 F. Supp. 3d at 856.

### A. Defendants' Alleged Violation of § 20109(a)(4) of the FRSA (Count I)

Defendants argue Plaintiff was terminated due to an "honestly held belief that…[he] was dishonest" in the claim related to the incident on January 29, 2020, which is "very serious" due to the fact that the honest reporting of injuries is necessary to keep Defendant Union Pacific's employees safe and to give it an opportunity to take corrective action. (Doc. 74, pgs. 2, 15-17). In Defendants' view, the circumstances of this case do not raise an inference that Plaintiff's reporting of an injury was a contributing factor in the decision to terminate his employment. (Doc. 74, pg. 15). As to the decision of Defendant James not to call Mr. Garfield and Mr. Strubinger as witnesses at Plaintiff's hearing, Defendants argue, despite the request of Local Chairman Black and the fact that they were working with Plaintiff at the time of the incident, their testimony would have added nothing to the proceeding. (Doc. 74, pg. 16). However, it would have placed a burden on Defendant Union Pacific's operations "to take two trainmen out of service for a full day with little to add" to the hearing. (Doc. 74, pg. 16). Defendants state Local Chairman Black could have arranged for that testimony on his own. (Doc. 74, pg. 16). Also, Defendants argue dishonesty, rather than the late reporting of an injury, was the proper charge, as "Plaintiff seemed to be falsifying the way in which the injury occurred." (Doc. 74, pg. 16).

In response, Plaintiff recounts, in detail, his view of the factual circumstances underlying the case. (Doc. 80, pgs. 21-24). Armed with the benefit of all reasonable inferences, Plaintiff argues a jury could find from those factual circumstances that his injury report was a contributing factor in Defendants' termination decision. (Doc. 80, pg. 24). Therefore, in his view, summary judgment cannot be granted for Defendants.

Now, § 20109(a) prohibits intentional discrimination by an employer in response to the protected activity of an employee. *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir. 2018) (citing 49 U.S.C. § 20109(a)). Therefore, since the essence of an intentional tort is a showing of discriminatory animus, the Seventh Circuit has found that "an employer violates the statute only if the adverse employment action is, at some level, *motivated* by discriminatory animus." *Id.* (Emphasis in original.) (quoting *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014)). With that in mind, the Court notes § 20109(a)(4) provides:

> **(a) In general**. A railroad carrier engaged in interstate or foreign commerce…or an officer or employee of such a railroad carrier, may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done—
>
> * * *
>
> **(4)** to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee.

49 U.S.C. § 20109(a)(4).

To establish a *prima facie* case under this statutory provision, Plaintiff must show (1) he engaged in protected activity by making a good faith complaint of an injury, (2) Defendants knew Plaintiff made a complaint of an injury, (3) Plaintiff suffered an adverse employment action, and (4) the complaint of an injury was a contributing factor in the adverse employment action. *Armstrong*, 880 F.3d at 381 (citing 49 U.S.C. § 20109(d)(2)(A); 29 C.F.R. § 1982.104(e)(2)). If Plaintiff is successful in establishing a *prima facie* case, then Defendants can escape liability by showing, through clear and convincing

7

evidence, that they would have taken the same employment action regardless of the protected activity. *Id.* (citing 49 U.S.C. § 42121(b)(2)(B)(ii); 29 C.F.R. § 1982.104(e)(4)).

As to the fourth element of Plaintiff's *prima facie* case, which is primarily at issue here, the Seventh Circuit has found a plaintiff "need not show that retaliation was the *sole* motivating factor in the adverse decision, [but] the statutory text requires a showing that retaliation was *a* motivating factor." *Id.* (Emphasis in original.). That is, although a plaintiff is not required to "conclusively demonstrate" retaliation was the only or main motivation of the defendant, "[t]hat does not mean…a plaintiff is not required to show that retaliation played at least some role in the decision." *Id.* (citing *Kuduk*, 768 F.3d at 791). The Seventh Circuit also reasoned that § 20109(a) requires a showing of discriminatory intent, which "necessarily includes some proof of retaliatory motive." *Id.* The Seventh Circuit explained, while the "contributing factor" standard of causation is a lower standard than those applied in other familiar anti-discrimination contexts, that "does not eliminate the need to demonstrate the existence of an improper motive." *Id.* (citing *Kuduk*, 768 F.3d at 791); *see also Armstrong v. BNSF Railway Co.*, 128 F. Supp. 3d 1079, 1091 (N.D. Ill. 2015) ("A contributing factor is something less than a substantial or motivating one; instead, the term means any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.' "). The Seventh Circuit has noted, "[t]he analysis of whether the employer possessed an improper (i.e., retaliatory) motive is separate from the analysis of whether, and to what extent, that motive influenced the employer's actions." *Armstrong*, 880 F.3d at 382; *accord King v. Indiana Harbor Belt R.R.*, No. 15-cv-245, 2018 WL 5982134, *7 (N.D. Ind. Nov. 13, 2018).

To satisfy the fourth element of a *prima facie* case, Plaintiff may present evidence of temporal proximity, pretext, inconsistent applications of policies, falsehoods or shifting explanations of the employer, antagonism or hostility toward the complainant's protected activity, or a change in attitude toward the complainant after the protected activity. *Cyrus v. Union Pac. R.R. Co.*, No. 12-cv-10248, 2015 WL 5675073, *11 (N.D. Ill. Sept. 24, 2015); *accord Perez v. Union Pac. R.R. Co.*, No. 19-cv-4135, 2023 WL 415543, *6-7 (N.D. Ill. Jan. 24, 2023). The Seventh Circuit has made clear, though, that Plaintiff "cannot point *only* to the sequence of events—an injury report followed by a later dismissal—to show that the complaint was a contributing factor in the adverse employment action." *Holloway v. Soo Line R.R. Co.*, 916 F.3d 641, 644 (7th Cir. 2019) (Emphasis added) (citing *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 877-78 (7th Cir. 2016); *Armstrong*, 880 F.3d at 382); *see also Martin v. Union Pac. R.R. Co.*, 663 F. Supp. 3d 833, 856-57 (N.D. Ill. 2023) (finding "proximity in time, without more, is not enough to get to trial"); *Armstrong*, 128 F. Supp. 3d at 1091 (noting circumstantial evidence, substantiating the sequence of events approach, whereby a plaintiff seeks to show the complaint of injury initiated the events culminating in an adverse employment action, may create fact disputes as to causation).

Before proceeding to an application of these legal principles to the facts of this case, the Court must address the supplemental authority identified by Plaintiff. That supplemental authority, *Murray v. UBS Sec.*, 601 U.S. 23 (2024), which was handed down by our Supreme Court in a unanimous Opinion on February 8, 2024, could be read to question the Seventh Circuit authority pertaining to the fourth element of a *prima facie* case under § 20109(a)(4). In *Murray*, our Supreme Court addressed 18 U.S.C. § 1514A,

which, like § 20109(a) in this case, is subject to "the 'legal burdens of proof set forth in section 42121(b) of title 49." *Murray*, 601 U.S. at 27. More specifically, §§ 20109(a) and 1514A both follow the "burden-shifting framework" whereby a plaintiff "bears the burden to prove that his protected activity 'was a contributing factor in the unfavorable personnel action alleged in the complaint.' " *Id.* (quoting § 42121(b)(2)(B)(ii)). This requires proof of intent, but only to the extent that "*a* reason for the adverse decision was the employee's protected conduct." *Id.* at 41 (Alito, J., concurring). The plaintiff need not prove the protected conduct was the only reason or the principal reason for the adverse employment decision, as a "[s]howing that it 'help[ed] to cause or bring about' that decision is enough." *Id.* (citing Concise Oxford Dictionary 310 (10th ed. 1999); Webster's Third New International Dictionary 496 (1993)). If the plaintiff makes the requisite showing, then, as alluded to above, "the burden shifts to the employer to show 'by clear and convincing evidence' that it 'would have taken the same unfavorable personnel action in the absence of' the protected activity." *Id.* at 27-28 (quoting § 42121(b)(2)(B)(ii)).

The particularly relevant question presented in *Murray* was whether "the phrase 'discriminate against an employee…because of,' " contained within § 1514A(a), requires proof that an employer acted with retaliatory intent. *Id.* at 26. Assuming "retaliatory intent" is something akin to animus, our Supreme Court answered that question in the negative. *Id.* at 26, 32-33. Therefore, although a plaintiff must prove his or her protected activity was a contributing factor in the unfavorable personnel action, our Supreme Court found he or she need not prove that the employer acted with retaliatory intent. *Id.* at 32, 39. It also recognized, however, a plaintiff's showing that an employer acted with

retaliatory animus remains one, but not the only, way for a plaintiff to prove his or her protected activity was a contributing factor in an adverse employment action. *Id.* at 37.

When reaching these conclusions, our Supreme Court noted the text of § 1514A does not include a retaliatory intent requirement. *Id.* at 32. Likewise, it reasoned that the word "discriminate," as used in § 1514A, "cannot bear the weight…place[d] on it" by the defendant and the Court of Appeals. *Id.* at 33-34. Indeed, our Supreme Court rejected the view that "the word 'discriminate' inherently requires retaliatory intent." *Id.* at 34-35. It opined that "[a]n animus-like 'retaliatory intent' requirement is simply absent from the definition of the word 'discriminate.' " *Id.* at 34; *see also Cont'l Cement Co. v. Sec'y of Labor*, 94 F.4th 729, 732 (8th Cir. 2024) (" '[A]n adverse action can be *motivated*, i.e., caused, by [an employee engaging in] a protected activity without the decisionmaker harboring discriminatory *animus*—i.e., harboring a desire to retaliate or punish.' ") (Emphasis in original.). For example, if an employer treats an employee worse—*i.e.*, by firing that employee—"because of" his or her protected activity, then the employer violates § 1514A, and it makes no difference whether a retaliatory animus was the motivation. *Murray*, 601 U.S. at 34-35. Moreover, our Supreme Court found § 1514A's "mandatory burden-shifting framework," which, again, is applicable to § 20109(a) here, could not "be squared with such a requirement." *Id.* In short, a requirement to prove an employer's retaliatory animus would ignore the statute's mandatory burden-shifting framework. *Id.* at 35.

While accepting that the word "discriminate" is relevant to an intent inquiry, however, our Supreme Court suggested that the only intent required is that mandated by the text of § 1514A, *i.e.*, an "intent to take some adverse employment action against…[an]

employee 'because of' his protected…activity." *Id*. at 35. After all, "a discriminatory discharge that is made 'because of' a particular factor necessarily involves an intentional choice in which that factor plays some role in the employer's thinking." *Id*. at 40 (Alito, J., concurring). The intent inquiry "has to be resolved through the contributing-factor burden-shifting framework," which, as in other contexts, facilitates the consideration of evidence on the difficult-to-prove question of discriminatory intent and provides the jury with a "full picture" before answering that question. *Id*. at 35-36.

Here, the Court need not opine, definitively, on the effect of *Murray* on the predominant Seventh Circuit authority for the fourth element of a *prima facie* case under § 20109(a)(4). Whether under Seventh Circuit authority, or the reasoning of our Supreme Court in the similar situation in *Murray*, Plaintiff identifies genuine disputes of material fact on that fourth element, which is the only element about which the parties argue.

Specifically, when Plaintiff tripped and fell, he was walking behind Mr. Garfield, and Mr. Strubinger was at his vehicle. (Doc. 80-1, pg. 13). Plaintiff was not sure if they witnessed the trip and fall, and he could not recall whether they helped him up. (Doc. 80-1, pg. 13). However, they helped him by coming over to the spot of the trip and fall, asking if he was okay, and gathering up his stuff. (Doc. 80-1, pg. 13). Plaintiff indicated Mr. Garfield and Mr. Strubinger were concerned for his well-being. (Doc. 80-1, pg. 13).

After obtaining medical treatment on February 9, 2020, Plaintiff immediately reported his injuries to Defendants on February 10, 2020. (Doc. 80-1, pg. 14). On February 11, 2020, Defendant James, who was Plaintiff's immediate supervisor, and Nick Smith, who was Defendant Union Pacific's superintendent of the St. Louis division, obtained a

12

personal injury report and investigatory report from Plaintiff. (Docs. 1-2; 1-4, pg. 40; 80-1, pgs. 5, 15, 20). In the personal injury report, Plaintiff indicated "a fall occurred and the rail caused injury" while it was dark. (Doc. 80-8). Plaintiff also signed an authorization for the release of his medical records for Defendant James. (Doc. 80-9, pgs. 22-23).

Moreover, on February 11, 2020, Mr. Garfield submitted a written report, stating:

> On 1/29/20 while working…I was loading my belongings on the platform, I heard commotion from behind "cursing etc." I turned around to see my engineer getting up off of the ground. I stopped what I was doing, went over and picked up his bag. I asked if he were ok, he stated he was fine, and [he] made no complaints to James or I that he was in any distress or [dis]comfort. Vic has worked every day since this incident with no complaints. He worked with no physical issues.

(Doc. 80-10).

Also on February 13, 2020, Defendant James obtained, via drone, an aerial photo of the "south end of the yard" where Plaintiff tripped and fell. (Doc. 74-12, pg. 2). Although a number of days had passed since the incident on January 29, 2020, Defendant James indicated the photo revealed nothing out of the ordinary on the yard. (Doc. 74-12, pg. 2). Similarly, Defendant James obtained video footage that depicted Plaintiff working between January 29, 2020, and February 9, 2020. (Doc. 74-12, pg. 2). Plaintiff was allegedly seen "laughing and joking, leaning onto a counter onto his ribs, carrying bags, [and] climbing on and off locomotives" in those videos. (Doc. 74-12, pg. 2).[3]

Thereafter, Defendant James considered separate charges for the late reporting of an injury, a non-dismissal event, and dishonesty, a dismissal event. (Doc. 74-12, pg. 2).

---

[3]Defendants manually filed the videos for the Court's review. (Doc. 75).

Ultimately, Defendant James charged Plaintiff with dishonesty, a dismissal event. (Doc. 74-12, pgs. 2-3). The hearing on that charge was governed by the rules and procedures agreed to by Defendant Union Pacific and the Brotherhood of Locomotive Engineers and Trainmen. (Doc. 74-12, pgs. 115-120). As to witnesses, the applicable rule provides:

> The engineer being investigated or the BLE representative may request the Carrier to direct a witness to attend an investigation, provided sufficient advance notice is given as well as a description of the testimony the witness would be expected to provide. If the Carrier declines to call the witness and the witness attends at the request of the engineer or BLE and provides relevant testimony which would not otherwise have been in the record, the carrier will compensate the witness as if it had directed the witness to attend.

(Doc. 74-12, pg. 119).

Local Chairman Black requested, a week in advance, for Mr. Garfield and Mr. Strubinger's testimony at the hearing. (Doc. 1-5). Nevertheless, they were not called to testify by Defendant James "because their testimony did not add anything to the proceedings and was a burden on operations." (Doc. 74-12, pg. 3). He "did not dispute whether…[Plaintiff] tripped walking to the locomotive," but he did dispute that Plaintiff "sustained severe injuries…in the manner claimed…and that he would still be able to continue to work in the manner that he did for eight more shifts." (Doc. 74-12, pg. 3).

Defendant James indicates he informed Local Chairman Black of that decision before the hearing, but Plaintiff appears to dispute that point. (Docs. 74-12, pg. 3; 80, pg. 22). At the hearing, Local Chairman Black objected on the basis that "the specific request for Conductor Mike Garfield and Brakeman James Strubinger has apparently been declined as the witnesses are not present." (Doc. 1-4, pg. 7). Local Chairman Black

14

emphasized his belief that they had firsthand testimony of the events in question. (Doc. 1-4, pgs. 7-8). Similarly, Plaintiff notes Defendant James did not produce expert medical evidence at the hearing, but Plaintiff did submit certain copies of his medical records from February 9 and 10, 2020. (Doc. 1-4, pgs. 79-85). Plaintiff suggests the medical evidence explains the delay in pain and the apparent timing of his injuries. (Doc. 1-4, pgs. 82-84).

In light of these circumstances, the Court concludes Plaintiff has presented evidence that identifies a genuine dispute of material fact as to whether Defendants discharged him "due, in whole *or in part*, to" an act done to notify Defendants of a work-related personal injury. *See* 49 U.S.C. § 20109(a)(4) (Emphasis added); *Cyrus*, 2015 WL 5675073, *11; *Perez*, 2023 WL 415543, *6-7; *see also Armstrong*, 128 F. Supp. 3d at 1088 ("Plaintiff's task at this initial [summary judgment] stage is not onerous, indeed, it is less demanding than the *McDonnell Douglas* standard employed in other employment actions."). In other words, Plaintiff has shown a genuine dispute of material fact as to whether that act was *a* contributing factor in Defendants' termination decision. *See* 49 U.S.C. § 20109(a)(4); *Armstrong*, 880 F.3d at 381; *Armstrong*, 128 F. Supp. 3d at 1091.

One example is Defendants' charging decision. A reasonable jury might conclude, when faced with a choice between charging Plaintiff with a late report of injury, a non-dismissal event, or dishonesty, a dismissal event, Defendants chose the latter charge "due, in whole or in part, to" the report of injury. *See* 49 U.S.C. § 20109(a)(4). On its face, the former charge, which involves a lesser consequence, is arguably more applicable to the circumstances, as "[a]ll cases of personal injury, while on duty…, must be accurately, timely, and immediately be reported to the proper manager." (Doc. 74-12, pg. 8). And,

obviously, Defendants would not have been faced with such decisions, resulting in Plaintiff's termination, if Plaintiff had not notified Defendants of his injuries and the way in which he believed they were suffered on Defendant Union Pacific's property. *See Armstrong*, 128 F. Supp. 3d at 1092 (finding a genuine issue of material fact as to "the low causation hurdle" where, *inter alia*, it was unclear whether the defendant would have initiated the investigation leading to the plaintiff's termination for dishonesty if he had not reported any injuries, the injury reports and the commencement of the investigation occurred within a day or two and were factually intertwined, and two of the three bases for the investigation related to whether the substance of the injury reports were truthful).

Another example is Defendants' decision making before and during the hearing, including the decision of Defendant James not to utilize the authorization for the release of medical records, to obtain medical records and interpretations, while also disputing Plaintiff's ability "to continue to work in the manner that he did for eight more shifts." *See Armstrong*, 880 F.3d at 381; (Docs. 74-12, pg. 3; 80, pg. 23). Defendant James also chose not to call Mr. Garfield and Mr. Strubinger, the two individuals working with Plaintiff at the time of the trip and fall, to testify at the hearing. Defendant James made that decision despite Plaintiff's request for their testimony. Even if Defendant James provided notice to Plaintiff that those witnesses would not be called at the hearing, meaning Plaintiff had to call the witnesses himself, it is striking for purposes of the fourth element of the *prima facie* case under § 20109(a)(4) that Defendants would take the self-serving position that those witnesses, whose absence would hinder Defendant Union Pacific's operations, had nothing relevant to add to the hearing. Again, Mr. Garfield and Mr. Strubinger were with

16

Plaintiff at the time of the incident, and, obviously, they had traversed the property under the same conditions as Plaintiff. Also, it is notable that Mr. Strubinger's written statement does not touch on the events of January 29, 2020, or any subsequent shifts with Plaintiff, but instead refers to a conversation he had with Plaintiff on February 10, 2020. (Doc. 74-12, pg. 9). One might wonder, if individuals who were with Plaintiff at the time of the trip and fall, and who traversed the property under the same conditions, were not important enough for Defendant James to require their testimony at a hearing on something as consequential as a dismissal event, what witness would be that important?

For these same reasons, the Court also finds Plaintiff identified a genuine dispute of material fact as to whether Defendants had the requisite intent for the termination decision. *See* 49 U.S.C. § 20109(a)(4); *Murray*, 601 U.S. at 32-35, 37, 39-41; *Armstrong*, 880 F.3d at 381-82. A reasonable jury could find, in light of the above circumstances and medical evidence, Plaintiff was terminated "due, in whole *or in part*, to" his act of notifying Defendants of work-related injuries. *See* 49 U.S.C. § 20109(a)(4) (Emphasis added). Defendants argue Plaintiff still would have been terminated for dishonesty, but that was not shown by clear and convincing evidence. *See Armstrong*, 880 F.3d at 381. Obviously, Defendants will be able to present that argument to a jury, but, absent clear and convincing evidence at this early stage, summary judgment must be denied. Indeed, the Court notes it is especially important to resist the temptation to weigh the evidence, assess credibility, and determine whether Plaintiff or Defendants have the more persuasive arguments under § 20109(a)(4) in light of the facts surrounding the incident and the medical evidence, as the only question presented on Count I is whether a genuine

17

dispute of material fact exists for the trier of fact in relation to the contribution of Plaintiff's injury complaint to Defendants' termination decision. *See Runkel*, 51 F.4th at 741; *see also Martin*, 663 F. Supp. 3d at 856 (recognizing "the existence of countervailing evidence is not a reason to grant summary judgment," as summary judgment does not involve weighing the evidence or deciding who has a more persuasive story to tell); *Armstrong*, 128 F. Supp. 3d at 1089-91 (finding disputed issues of material fact precluded summary judgment where, *inter alia*, the defendant's arguments as to the brief nature of an assault, the plaintiff's credibility in light of his conduct and testimony on the injuries suffered, and conflicting medical evidence were better suited for the jury).

Finally, in Count I, Plaintiff seeks punitive damages. (Doc. 1, pg. 5). Defendants argue that request is inappropriate, especially from each Defendant individually. (Doc. 74, pg. 17). On the merits of that request, Defendants note the administrative entities found the termination decision was not wrongful, let alone indicative of a reckless disregard for Plaintiff's rights. (Doc. 74, pgs. 17-18). Plaintiff responds that a jury must decide if punitive damages are warranted under the circumstances. (Doc. 74, pgs. 24-25).

Section 20109(e)(3) states relief "may include punitive damages in an amount not to exceed $250,000." *See* 49 U.S.C. § 20109(e)(3). However, in light of the genuine disputes of material fact identified by the Court, which must be resolved by a jury, the Court finds it would be inappropriate to grant summary judgment on Plaintiff's request for punitive damages. In short, the Court will not address the issue at this time because the propriety of punitive damages will depend upon how the jury resolves those genuine disputes of material fact. *See Fresquez v. BNSF Railway Co.*, 52 F. 4th 1280, 1318-19 (10th Cir. 2022).

For these reasons, the request for summary judgment on Count I is **DENIED**.

**B. Defendant Union Pacific's Alleged Negligence Under § 51 of FELA (Count II)**

Next, Defendant Union Pacific argues Plaintiff offered no evidence regarding the location or cause of his trip and fall, that his injuries were sustained on January 29, 2020, or that his injuries were foreseeable to or caused by Defendant Union Pacific. (Doc. 74, pgs. 1-2, 12-15). Defendant Union Pacific emphasizes, "Plaintiff did not know or see what he stumbled on" during the incident. (Doc. 74, pg. 13). However, Defendant Union Pacific indicates its doctor, Dr. Andrew Agos, opined that Plaintiff's rib and spleen injuries "might or could be related to a 2018 motor vehicle injury." (Doc. 74, pg. 14). Further, by extension of Plaintiff's failure to know what caused his trip and fall, Defendant Union Pacific argues it could not be on notice of a dangerous condition. (Doc. 74, pg. 14).

Plaintiff counters that, consistent with the allegations in the Complaint, "there is evidence of predawn darkness, overhead lighting that still required the use of a flashlight[,] and the existence of debris, such as tie butts, upon the ground." (Doc. 80, pg. 17). Defendant Union Pacific allegedly failed to counter his evidence of artificial overhead lighting that was inadequate for safe walking, which he believes is sufficient, by itself, to preclude summary judgment. (Doc. 80, pgs. 17-18). Indeed, Plaintiff suggests there were "prior complaints about the artificial lighting…that resulted in no change." (Doc. 80, pg. 18). Plaintiff also argues the circumstantial evidence of debris, which "was easily observed in the daylight, but not necessarily…[in] nighttime," would allow a reasonable jury to conclude Plaintiff stumbled on debris due to the morning darkness and inadequate lighting. (Doc. 80, pgs. 17-18). Finally, in response to the allegation that his

19

injuries did not occur on January 29, 2020, Plaintiff argues there is a genuine dispute of material act because the physicians' assistant who treated him in the emergency room attributed his injuries to the trip and fall on January 29, 2020, while Dr. Agos attributed those injuries to a motor vehicle accident on December 19, 2018. (Doc. 80, pg. 19). Nevertheless, Dr. Agos allegedly stated Plaintiff's injuries were aggravated by the January 29, 2020, incident, and that is compensable under FELA. (Doc. 80, pg. 19).

> Section 51 of FELA provides as follows:
>
> Every common carrier by railroad while engaging in commerce between any of the several States or Territories…shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce…for such injury…resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51.

Under this statutory provision, Plaintiff must prove the traditional elements of negligence, namely, a duty held and breached by Defendant Union Pacific, the foreseeability of injury, and causation between the breach of duty and injury. *Jaranowski v. Indiana Harbor Belt R.R. Co.*, 72 F.4th 744, 749 (7th Cir. 2023) (quoting *Abernathy v. E. Illinois R.R. Co.*, 940 F.3d 982, 988 (7th Cir. 2019)); *accord Ruark v. Union Pacific R.R. Co.*, 916 F.3d 619, 625-26 (7th Cir. 2019). Defendant Union Pacific's duty is to provide a safe workplace, which contemplates reasonable inspections. *Crayton v. Wisconsin Cent., Ltd.*, 667 F. Supp. 3d 896, 906 (N.D. Ill. 2023) (quoting *Murphy v. Wisconsin Cent. Ltd.*, No. 19-cv-1232, 2022 WL 1166537, *6 (E.D. Wisc. April 20, 2022)). Further, foreseeability of injury

means Defendant Union Pacific had actual or constructive notice of the conditions that Plaintiff alleges were dangerous. *Jaranowski*, 72 F.4th at 749 (quoting *Holbrook v. Norfolk S. Ry. Co.*, 414 F.3d 739, 742 (7th Cir. 2005)); *see also LeDure v. Union Pacific R.R. Co.*, 962 F.3d 907, 910 (7th Cir. 2020) (stating foreseeability, *i.e.*, "whether there were 'circumstances which a reasonable person would foresee as creating a potential for harm," as measured by actual or constructive notice, is an essential element to a FELA claim based on unsafe work conditions); *Crayton*, 667 F. Supp. 3d at 906 (stating constructive notice is established when a plaintiff shows the defendant could have discovered the allegedly defective condition through reasonable inspection and remediation of the situation).

Also, FELA "was written 'to offer broad remedial relief to railroad workers,' " so Plaintiff's burden on Count II "is 'significantly lighter than in an ordinary negligence case.' " *Jaranowski*, 72 F.4th at 749 (quoting *Holbrook*, 414 F.3d at 741-42); *see also Perez*, 2023 WL 415543 at *3 ("The FELA affords railroad workers with relatively broad latitude in prosecuting personal injury cases against their employers."). Defendant Union Pacific is liable if its negligence played any part, even the slightest part, in producing Plaintiff's injury, and the Court must submit the case to a jury if there is even the slightest evidence of negligence by Defendant Union Pacific. *Jaranowski*, 72 F.4th at 749 (quoting *Holbrook*, 414 F.3d at 742; *Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990)); *accord Ruark*, 916 F.3d at 625. As the Seventh Circuit has illustrated, "the amount of evidence required to submit a FELA case to the jury is 'scarcely more substantial than pigeon bone broth.' " *Ruark*, 916 F.3d at 625 (citation to internal quotation omitted). This "lowered threshold" does not, however, make an employer responsible for any injury

occurring during employment, as FELA is not a workers' compensation statute that insures on-duty employees. *Id.* (quoting *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543-44 (1994)); *accord Holbrook*, 414 F.3d at 742. Therefore, while there is certainly a "lowered threshold" at play, "[a] FELA plaintiff is not impervious to summary judgment[] [i]f the plaintiff presents no evidence whatsoever to support the inference of negligence.' " *Ruark*, 916 F.3d at 626 (quoting *Lisek v. Norfolk & W. Ry. Co.*, 30 F.3d 823, 832 (7th Cir. 1994)).

Here, it is undisputed that Defendant Union Pacific had a duty to provide a safe workplace to Plaintiff. *See Crayton*, 667 F. Supp. 3d at 906. Therefore, the only elements of negligence at issue are those related to a breach of that duty, foreseeability, and causation. *See Jaranowski*, 72 F.4th at 749; *Ruark*, 916 F.3d at 625-26. In light of the facts discussed below, Plaintiff has identified genuine disputes of material fact on those elements.

In his deposition, Plaintiff stated the overhead lights on Defendant Union Pacific's property were "low" and not "the brightest," so he was using a flashlight on January 29, 2020. (Doc. 74-1, pg. 9). Since he was looking ahead with his flashlight, Plaintiff could not see everything in front of him in the dark. (Doc. 74-1, pg. 9). While walking to his locomotive, Plaintiff "stumbled over something, tried to catch [him]self, fell face forward towards the rail, and hit the rail with…[his] chest." (Doc. 74-1, pg. 9). Since there was "low visibility," Plaintiff "really didn't see" what caused him to trip. (Doc. 74-1, pg. 9).

However, Plaintiff noted that a typical railyard has debris, such as tie butts, which are pieces of broken wood, lying on the ground. (Doc. 74-1, pg. 9). Plaintiff indicated the debris caused him to trip and fall, but he does not know specifically what kind of debris. (Doc. 74-1, pg. 10). In daylight, Plaintiff indicated he would have been able see the debris.

(Doc. 74-1, pg. 10). Plaintiff also stated "[m]anagement knows that there's debris all over the yard. They drive that yard all the time." (Doc. 74-1, pg. 18). In fact, a picture of the yard, taken the week after Plaintiff's trip and fall on January 29, 2020, depicted tie butts "lying amongst the ballast" in the photograph. (Docs. 1-4, pgs. 55-56; 80-2). At Plaintiff's disciplinary hearing, Defendant James testified that the photograph represented the typical look of the yard. (Docs. 1-4, pgs. 55-56; 80-2). He acknowledged that there "were pieces of wood present in t[he] photo in the walking paths." (Docs. 1-4, pgs. 55-56; 80-2).

Further, in the past, Plaintiff testified that he reported issues with the ground and lighting conditions in his work area. (Doc. 80-1, pg. 12). Plaintiff did not recall to whom he specifically reported, but he thought the reports were made to a safety committee. (Doc. 80-1, pgs. 12-13). Plaintiff was a union representative on that safety committee, which met with managers on a monthly basis. (Doc. 80-1, pg. 12). Plaintiff clarified, "I was the union rep that was reporting these issues." (Doc. 80-1, pg. 12). He stated, "when I've had problems with low lighting, nothing has ever been done." (Doc. 80-1, pg. 12).

After his trip and fall, Plaintiff felt like he had a bad bruise to the chest. (Doc. 80-1, pg. 14). Until the evening of February 9, 2020, when Plaintiff believed he was having a heart attack, he thought the bruising pain in the chest was improving. (Doc. 80-1, pgs. 14, 16). Plaintiff presented to the Emergency Department at St. Anthony's Hospital in Effingham, Illinois, where he was treated by a Physicians' Assistant, Bobbie Miller. (Docs. 80-1, pg. 16; 80-3, pgs. 3-4). Plaintiff complained of chest pain and shortness of breath. (Doc. 80-3, pg. 8). PA Miller ordered an electrocardiogram and laboratory tests to rule out a heart attack and blood clot. (Doc. 80-3, pgs. 4, 8). PA Miller also ordered a CT scan,

which revealed unhealed fractures to the seventh, eighth, and ninth ribs on the left side

of Plaintiff's chest. (Docs. 80-3, pgs. 4-5, 8; 80-5, pg. 2). Plaintiff was also experiencing

bleeding from a ruptured spleen. (Doc. 80-3, pg. 10). In light of this evidence of trauma,

PA Miller asked Plaintiff if something had happened to cause those injuries. (Doc. 80-3,

pgs. 4-5, 13). Plaintiff did not inform PA Miller of any trauma other than the trip and fall

on January 29, 2020. (Doc. 80-3, pgs. 6, 13). PA Miller's notes indicate the following:

> Of note: Later in visit patient advised that he did fall about 1 to 1.5 weeks
> ago at work. States he is an engineer for the railroad. He slipped and fell
> onto railroad track hitting his left upper abdomen/left lower chest area.
> States it has been a little sore but never had severe pain until tonight. Says
> he didn't think much of it but thought he should mention that this occurred.

(Doc. 80-4, pg. 2).

PA Miller noted that Plaintiff's fractures were "referred to as subacute by the

radiologist, meaning that they probably didn't happen" on the date of presentation. (Doc.

80-3, pgs. 8-9). PA Miller further noted that "when somebody breaks a bone or has a

fracture, it immediately will start to try to repair itself by growing new bone material,

which would show up as sclerosis." (Doc. 80-3, pg. 9). If a rib fracture occurred on the

date of presentation, then there would be "really sharp lines and no white fuzzy

material." (Doc. 80-3, pg. 9). Since sclerosis was observed in relation to Plaintiff's ribs, "it

appeared that they were in the process of healing, although not completely healed." (Doc.

80-6, pg. 9). Therefore, PA Miller also stated that she did not believe Plaintiff's rib

fractures occurred in relation to a motor vehicle accident in December 2018. (Doc. 80-3,

pg. 9). If the rib fractures occurred at that time, then PA Miller believed "they would have

been completely healed, although sclerosed, but…you would see where the bone had

finished repairing itself." (Doc. 80-3, pg. 9). Instead, PA Miller stated it generally takes 6 to 8 weeks for bones to heal, and it was her opinion that Plaintiff's rib fractures occurred within 2 weeks of his presentation at St. Anthony's Hospital. (Doc. 80-3, pgs. 9-11). Similarly, it was PA Miller's opinion that the ruptured spleen was "[s]omewhat below" the location of Plaintiff's three fractured ribs. (Doc. 80-3, pg. 11). She explained that "the spleen is more commonly lacerated from blunt trauma." (Doc. 80-3, pgs. 11-12).

For its part, Defendant Union Pacific retained Dr. Agos in this case. He is a clinical professor and trauma acute care general surgeon. (Doc. 80-6, pg. 4). Dr. Agos reviewed Plaintiff's medical records, including the radiological reports at issue, and the security videos provided by Defendant Union Pacific. (Doc. 80-6, pgs. 7-8). With respect to the radiological report Plaintiff obtained in February 2020, Dr. Agos indicated as follows:

> [T]he report is what it is. That's what the radiologist dictated and saw. In my experience and in my understanding of healing, it's unusual to see a rib to start to heal in this age group within a ten-day period. So that's why it was a little unusual to me that there's a dictation that there's…healing rib fractures in such a short period of time.

(Doc. 80-6, pg. 12).

Dr. Agos stated "my opinion is that it's odd to see healing that quickly in an adult…attributed to the [2020] fall versus the [2018] car accident." (Doc. 80-6, pg. 13). He also stated, "there's no doubt that there's injuries to the ribs there, but I suspect those were more from the '18 accident than they were from the…'20 accident." (Doc. 80-6, pg. 13). Dr. Agos suspected that each rib was injured in December 2018, "but they just weren't diagnosed because it was a plain x-ray versus a CAT scan." (Doc. 80-6, pg. 17). As to Plaintiff's spleen, Dr. Agos indicated "the timing seems a little bit off." (Doc. 80-6, pg. 19).

Finally, Dr. Agos indicated Plaintiff's trip and fall on January 29, 2020, could have aggravated preexisting rib injuries. (Doc. 80-6, pg. 16). Aside from information about the December 2018 motor vehicle accident and the January 2020 trip and fall, Dr. Agos did not receive any other information concerning injuries to Plaintiff. (Doc. 80-6, pg. 12).

From this factual record, the Court concludes there are genuine disputes of material fact as to the remaining elements of Plaintiff's claim of negligence. *See Perez*, 2023 WL 415543 at *3 (stating "an employee is entitled to proceed before the jury if he has adduced any evidence sufficient" to reasonably justify a conclusion regarding the employer's negligence). A reasonable jury could find Plaintiff was not provided a safe workplace due to the "low" lighting that was not "the brightest." *See Crayton*, 667 F. Supp. 3d at 906; (Doc. 74-1, pg. 9). Likewise, while it is true Plaintiff cannot specifically identify the debris that caused him to stumble, the testimony and photographic evidence indicates tie butts were typically found on Defendant Union Pacific's yard, "lying amongst the ballast" and in the walking paths. (Docs. 1-4, pgs. 55-56; 74-1, pgs. 9-10; 80-2). A reasonable jury could also conclude that typical state of the yard provided, at least, constructive notice of a tripping hazard that could cause injury in the dark. *See Jaranowski*, 72 F.4th at 749; *LeDure*, 962 F.3d at 910; *Crayton*, 667 F. Supp. 3d at 906. Plaintiff testified that Defendant Union Pacific's managers "kn[ew] that there…[was] debris all over the yard," as "[t]hey drive that yard all the time." (Doc. 74-1, pg. 18). Further, as to the lighting issue, Plaintiff indicates he complained of lighting issues while on a safety committee with Defendant Union Pacific's managers, yet "nothing ha[d] ever been done." (Doc. 80-1, pg. 12). In short, a reasonable jury could conclude the dim lighting,

combined with the tie butts "lying amongst the ballast" and in the walking paths, caused Plaintiff's injuries. This is especially true in light of the obvious disagreements of PA Miller and Dr. Agos on the medical evidence, which largely involve issues of weight and credibility that must be assessed by the trier of fact and not the Court.

For these reasons, the request for summary judgment on Count II is **DENIED**. *See Jaranowski*, 72 F.4th at 750-51 (concluding, when viewed through the summary judgment lens, the plaintiff's proffered evidence would allow a reasonable jury to find the defendant railroad was negligent, where, *inter alia*, the defendant railroad's own safety director and a certified track inspector testified based on photographs that vegetation and debris could have interfered with a switch operation, the court could not engage in "jobs for a factfinder" when considering competing views related to an inspection, a jury could accept the plaintiff's view of the facts regarding whether the inspection was conducted without due care, and a jury could find constructive notice based on competing testimony that more time and effort was spent cleaning and maintaining a switch than was spent inspecting or discovering defects in the switch).

### III. CONCLUSION

As explained above, Plaintiff's Motion to Strike (Doc. 82) and Defendants' Motion for Summary Judgment (Doc. 74) are **DENIED**.

**SO ORDERED.**

Dated: March 26, 2024

s/ *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge